### GOLDENBERG v. NUGENT et al. *
### No. 5101.

Court of Appeal of Louisiana.
Second Circuit.
June 29, 1935.

Chas. L. Mayer, of Shreveport, and A. Miles Coe, of New Orleans, for defendants appellants.

*Rehearing denied July 15, 1935.

460

Minnie Frumer, of Shreveport, for plaintiff appellee.

Hendrick & Hendrick, of Shreveport, for defendant appellee.

DREW, Judge.

Plaintiff instituted this suit against J. E. Nugent, the Modern Cab Company, and Owners' Automobile Insurance Company for the sum of $300 and interest, for alleged damages caused to her by a collision between a cab owned and operated by the Modern Cab Company and a car driven by J. E. Nugent. The insurance company made defendant is alleged to be the insurer of the Modern Cab Company.

Plaintiff was awarded judgment as prayed for in the lower court against the Modern Cab Company and its insurer, and her demands rejected as against J. E. Nugent.

There was no appeal from the judgment in favor of Nugent. The other two defendants who were cast have appealed to this court.

If the cab company is liable, the insurance company is likewise, is admitted. Since defendant Nugent has passed out of the case, we will only recite the pleadings applicable to the cab company, which will hereafter be referred to as defendant.

Plaintiff alleged for a cause of action that she was a paid passenger in one of defendant's cabs on June 30, 1934, at the time going down Texas avenue on the way to her home; that the driver of the cab was named J. J. Johnson; that near the intersection of Texas avenue and Jordan street the car driven by Nugent hit the rear of the cab in which she was riding with such force as to render her unconscious for several moments, and, upon regaining consciousness, to be in such a state of mind as to be unable to relate what happened thereafter; that as a result of said injuries received, on the next day, upon the advice of a physician, plaintiff was taken to a sanitarium, where she remained until July 10th; and that after returning to her home, she became worse and returned to the sanitarium, where she remained until July 29th. She further alleged that the driver of the Modern cab caused the accident by his gross carelessness, want of skill, and disregard of her rights; that he was not keeping a proper lookout for approaching cars and gave no signal as to his movements. Plaintiff further alleged that defendant owed her a legal duty of safely transporting her to her destination, and, by allowing her to be injured, failed in this said duty.

The manner in which plaintiff itemizes her damages is as follows: "That she has a hospital bill amounting to $145.00 incurred as the result of injuries sustained in said collision; that she is still ill and nervous as a result of the shock; that her vision was affected; and that she suffered a loss of two months' time from her employment."

Defendant filed a plea of vagueness, alleging the petition was vague and indefinite in the following respects:

"1. That plaintiff has failed to state the direction in which the cab was being driven at the time of the accident;

"2. That plaintiff has failed to set forth, with sufficient particularity, the manner in which the accident occurred;

"3. That plaintiff has failed to set forth with sufficient particularity the items for which she is seeking to recover damages."

The lower court held the petition vague in that it did not set forth the direction the cab was traveling, and in all other respects overruled the plea. Plaintiff then filed an amended petition setting out that the cab in which she was riding was traveling in a southerly direction on Texas avenue at the time of the accident. She further alleged that she had incurred a hospital bill amounting to $145 as a result of the injury sustained in the collision; that she was still nervous and ill as a result of the accident; that the nerves of the eyes are affected and she is undergoing treatment for same, causing her to be put to much expense; and that she has lost two months from her employment on account of her injuries.

Defendant answered, denying each and every article of plaintiff's petition, after first filing an exception of no cause of action, which was overruled.

In this court defendant seriously urges the exception of no cause of action and the plea of vagueness. It likewise urges with much force that plaintiff was not injured in the alleged collision, and a careful study of the case convinces us of the soundness of this last contention. That being true, it will forever put an end to the case, and makes it unnecessary to pass upon the plea and exception filed by defendant. It likewise makes it unnecessary to pass upon

the question of defendant's negligence, which is not at all free from doubt.

The facts in the case are as follows:

Mr. Nugent was driving his car in a southerly direction on Texas avenue in the city of Shreveport. Defendant's cab, with the plaintiff as a passenger, was traveling in the same direction. Nugent was traveling at the rate of ten miles per hour and defendant's cab at a rate of approximately twenty miles per hour. Upon nearing the intersection of Texas avenue and Jordan street, defendant's cab passed to the left of Nugent, and upon arriving at the intersection, the light being red, was brought to a stop. Nugent attempted to bring his car to a stop, but did not succeed until he had lightly struck the cab, the left front bumper of the Nugent car striking the right rear bumper of the cab. There was a man on the front seat of the cab with the driver, and plaintiff was alone on the rear seat. In the Nugent car there was also a man on the front seat with Mr. Nugent. These four witnesses all testified that the force caused by the impact was very light and did not jar them in the least; that there were no signs or marks on either bumper to indicate there had been a collision, and, in fact, the occupants of either car would have paid no attention to the collision if plaintiff had not complained of being hurt.

Plaintiff is 33 years of age, single, and weighs approximately 200 pounds, and had some time prior to the accident been employed as a saleslady. She described the effect of the accident upon her as follows:

"Q. When the collision occurred what effect did it have upon your posture? A. In what way—what do you mean? How did it affect me?

"Q. Were you thrown from the seat, or what? A. I must have been, I don't remember but I do know that I had a terrible pain across my head where I struck myself and across the back of my neck and shoulders.

"Q. You say you don't remember whether you fell to the floor, or where your head hit, whether it hit the ceiling or what? A. I don't have any idea; I heard someone say, 'Oh, God, you have hurt a lady'; I don't know who it was said it.

"Q. Did your head show that a collision had taken place? A. Yes.

"Q. Did your head show that it had struck something? A. Yes. Had a bruised spot across here, and a bruise across the bottom of my eye.

"Q. Was there any concussion indicated?

"By Mr. Hendricks: We object—

"Q. I withdraw the question. Since the accident, and since you were hurt, in what way, if in any way, have you been affected? A. Extremely nervous, and still running temperature.

"Q. Were you so affected prior to the accident? A. No.

"Q. Were you in the habit of running temperature prior to the accident? A. No, sir.

"Q. I will ask you if any symptoms, or other conditions, resulted? * * *

"Q. Did you say that you had any other physical condition to develop from this accident that you had not had before? A. Nothing, none at all, only extreme nervousness, and my sight, and this severe headache.

"Q. In what way has your sight been affected? * * * A. Due to extreme shock.

"Q. What was the extent, or the character, of the affection? A. It is the nerves in the eye.

"Q. In what way has that affected your vision? A. Everything that I look at jumps, and extreme light affects the sight, and I see everything double.

"Q. Was that condition present prior to the accident? A. It was not.

"Q. Were any of the symptoms present prior to the accident. A. Not that I know of.

"Q. Prior to the accident you had never experienced that? A. No, sir. * * *

"Q. Have you consulted a specialist with regard to your eyes? A. I have.

"Q. Whom did you consult? A. Dr. Woolworth and Dr. Gray.

"Q. Did those physicians examine your eyes? A. They did.

"Q. Did they treat them? A. Yes, sir.

"Q. What was the duration of the treatment? A. I went up to see them every day, or every other day, for over two, or three weeks."

On cross-examination, as to the action of the cab just prior to the accident and as to whether it was standing still when struck from behind or not, her answers were that she did not know. She also testified that she had not been employed for

a month or six weeks before the accident. She said she knew nothing about the accident, how it happened, or how she received the injuries for which she is now claiming damages. Plaintiff merely knows that she became unconscious momentarily, and, when she regained consciousness, that she was nauseated, dizzy, and her head hurt. She remembers passing the light at Murphy street and Texas avenue, which is two blocks away from the place of the accident. She has no recollection of arriving at the point of accident. Plaintiff further testified that after the accident and in the month of September she secured employment as a saleslady, worked one week, and had to quit on account of extreme nervousness and running of temperature. She further testified that something must have struck her, but she did not remember anything hitting her.

Dr. Heard testified that he was the regular physician for plaintiff and had treated her on numerous occasions for the past ten or eleven years; that she had come for treatment every month or two during that time for more or less trivial things, like headache, indigestion, etc. When he examined plaintiff the next day after the accident, he found no bruises; and only saw a dark place under the left eye, and said it would be hard for him to say what caused it, for the reason that some women tend to stay dark under the eyes. He further testified as follows:

"Q. Was there any such unusual symptoms in this case? A. I could not tell you.

"Q. Did you make an examination of her neck; was it swollen? A. I looked at it; felt it, I could not say that it was swollen.

"Q. Did it show any evidence of her having been struck back of her neck, or anything? A. No, I could not say that she had been struck.

"Q. Could you say she had been struck on her forehead? A. No.

"Q. You couldn't find any bruise, or scars, to show? A. I didn't see any.

"Q. Is it not the usual thing that a person who is suffering from dizziness, or some internal trouble caused from having received a lick to the head, that you usually can find, or locate, or see from examination where she was hit? A. Not, necessarily, when they are struck in the scalp. You can get a blow in the hair that will not show.

"Q. How about the forehead? A. It ought to show on the forehead.

"Q. How about the back of your neck? A. That possibly would show.

"Q. But she didn't have any sign on the back of her neck, or on her forehead? A. I didn't see it.

"Q. If she had received a lick, or been struck, you didn't see it? A. I did not see it.

"Q. Did you examine her leg? A. I don't remember.

"Q. She stated a few minutes ago that she received injuries to her leg? A. I don't remember about that. I was concentrating on her head.

"Q. Why were you concentrating on her head? A. On account of the history she gave me, she was dizzy, nauseated, and had a severe headache.

"Q. Could you tell whether or not from your examination, without the history, can you tell whether or not there was anything wrong with her head? A. There was evidently something wrong with her; I didn't know what was the cause of it.

"Q. Why would you say it was evident that there was something wrong with her; from her actions and your observation, why would you say that? A. If a person comes in complaining of a headache, dizziness, nausea, and a sore head, wouldn't you think there was something wrong with them?

"Q. Is it not possible for a person to come into your office, complaining, and you can tell from an examination whether they are suffering or not? A. Do you mean whether objective, or subjective symptoms; if the thing complained of you can't see you have to take their word for it, those are subjective symptoms. The objective symptoms, the objects are things you can put your hands on. I couldn't say what the cause was, I had to have the history to know what to do for her."

Dr. Heard further testified:

"Q. During your long course of practice you have had cases where the patient was feigning illness, have you not? A. Yes, sir.

"Q. When you had such cases you recognized it, did you not? A. Well, now you get into something there that is a pretty hard thing. Some cases of malingerers, they are such experts, and they know the symptoms so well, and some have been coached so well, they can carry it out to

perfection; it is one of the hardest things in the world to catch a malingerer.

"Q. You stated you have had, and recognized, some cases of malingerers? A. Yes, sir, some of them are easy to detect.

"Q. You stated that you saw nothing in Miss Goldenberg's attitude or action to indicate to you that she was feigning sickness? A. She didn't impress me that way at all; I have in my mind no question but that there was something the matter with her.

"Q. When you stated she might be called as something in the nature of a chronic patient, do you mean anything more than that she, like good many people, from time to time has consulted you? A. Some people have many complaints that seem to worry them a lot; that is the type you maybe would call her; some people come to you one day with the earache, next day the throat is sore, the next day the toe ache—that is the case you call a chronic case."

Dr. Heard then testified that he did not find anything to indicate trauma.

Plaintiff did not place on the stand as a witness the eye specialist she claims to have visited.

We have mentioned the above facts and quoted from the doctor's testimony, for what it is worth, for, regardless of plaintiff's condition, it is certain it was not caused by the very light impact of the bumper of the Nugent car with the bumper of defendant's car. The impact, as shown by the testimony of four witnesses, was as light as it would be possible for two cars to impact. It caused neither car to move and did not jar any of the four witnesses. Plaintiff was sitting erect on the back seat of the car before the impact occurred, and remained in that position after the impact. She was not thrown off the seat nor was the impact sufficient to cause her to bump the front seat. None of the four witnesses who saw her immediately afterwards thought she was unconscious, and her actions immediately after the impact show clearly that she was not. We are unable to understand why plaintiff, if she was injured, cannot give the court some explanation of the manner in which she was. She has failed to do so and relies solely on the statement that she momentarily became unconscious and does not know in what manner her injuries were received. The impact was not sufficient to knock her unconscious, nor was it sufficient to even jar her or to cause her to bump her head. The troubles of which plaintiff complains since the accident, if not imaginary, were caused by something else other than the collision.

The judgment of the lower court is erroneous, and is therefore reversed; and plaintiff's demands are rejected at her costs.